IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DANIEL RAY BROWN                                                    PLAINTIFF

          v.                        Civil No. 12-3150

SHERIFF DANNY HICKMAN;
JAIL ADMINISTRATOR JASON
DAY; BOB KING; DETECTIVE
RYAN WATSON; SUE FALLON;
DR. LEE; and NURSE MANDY JONES                                     DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

Plaintiff is not currently incarcerated and lives in Harrison, Arkansas.  The events that

are the subject of this suit occurred while Plaintiff was incarcerated in the Boone County

Detention Center (BCDC).  Plaintiff maintains his constitutional rights were violated in the

following ways: (1) Nurse Jones and Dr. Lee were deliberately indifferent to his medical needs;

(2) Defendants Hickman, King, and Watson failed to investigate crimes allegedly committed

against the Plaintiff; (3) Defendants' postcard only mail policy violated the Plaintiff's First

Amendment rights; (4) Plaintiff was denied access to the law library; and (5) Defendants

Hickman, King, and Watson retaliated against him.

Defendants filed a Motion for Summary Judgment (Doc. 36).  The Plaintiff asked the

Court's assistance in responding to the Motion by the preparation of a questionnaire.  The

questionnaire was prepared and Plaintiff has now filed his Response (Doc. 42).  The Motion is

ready for decision.

-1-

## 1.  Background

Plaintiff was incarcerated in the BCDC from August 31, 2012, until August 16, 2013 and then again from August 27, 2013, until September 11, 2013.  *Plaintiff's Response*, *Doc. 42* (hereinafter *Resp.*) at ¶ 1.  According to Plaintiff, he began verbalizing requests for medical care as early as September of 2012.  *Id.* at ¶ 3(A).  Specifically, he states he spoke with Nurse Jones in September of 2012 and twice in October of 2012.  *Id.*  at ¶ 3(E).

The first written medical request contained in the summary judgment record is dated November 9, 2012.  *Resp.* at pg. 40.  Plaintiff said that it was just as a reminder that he wanted to see the doctor about getting a CT scan because he was experiencing amnesia, memory loss, double vision, headaches, and nausea.  *Id.* at ¶ 3(B); *Defendants' Exhibit* (hereinafter *Defts' Ex.*) C-1 at 1.  Plaintiff stated he also needed attention for a "leg high sprain or fracture."  *Resp.* at ¶ 3(D).  Plaintiff states he sprained or fractured his ankle when walking in B-pod.  *Id.*

He alleged that the problems with amnesia, memory loss, double vision, headaches, and nausea were a result of injuries he sustained when he was kidnaped.  *Resp.* at ¶ 3(C).  In fact, Plaintiff indicated he was kidnaped on three separate occasions.  *Resp.* at ¶ 3(C).  The first kidnaping occurred on or about May 1, 2012.  *Id.*  He was kidnaped by Steve Gillham and his cousin Richie.  *Id.*  He was held captive for about three hours.  *Id.* at ¶ 10(I).  He states he was punched in the back of the head twice, lost consciousness, and was electrocuted.  *Id.* at 3(C).  He did not seek medical attention at the time because he did not know the severity of his injuries.  *Id.*  Plaintiff believes he suffered a concussion and states he was confused and having memory problems.  *Id.*

The second kidnaping occurred on June 2, 2012.[1] *Resp.* at ¶ 3(C). He was kidnaped by Rudy Salisbury. *Id.* He states he was lead into a trap where he was choked unconscious. *Id.* Gary Buyerley and Bridgette Varner were present. *Id.*

The final kidnaping occurred on June 29, 2012.[2] *Resp.* at ¶ 3(C). Plaintiff states he was again lead into a trap. *Id.* Buyerley held his arm and Salisbury would not let him go. *Id.* Plaintiff did not sustain any injuries during this kidnaping. *Id.* The latter two kidnapings were the result of Plaintiff owing Salisbury money. *Id.*

Plaintiff maintains he submitted medical requests prior to November 9th. *Resp.* at ¶ 3(E). He maintains two grievances are missing. *Id.* On November 10th, Nurse Jones indicated Plaintiff was scheduled to be seen. *Id.* at ¶ 3(F).

On November 11th, Plaintiff submitted a grievance/request form to the Nurse, Jason Day, and Ryan Watson. *Resp.* at ¶ 4(A) & pg. 41. Plaintiff stated the nurse was supposed to refer him to Dr. Lee to get a CT scan and x-rays. *Id.* at ¶ 4(B). He asked who would refer him to a neurologist. *Id.*

Plaintiff was seen by Dr. Lee on November 13th. *Resp.* at ¶ 4(C). After he examined the Plaintiff, Dr. Lee ordered an MRI of Plaintiff's brain. *Id.* Plaintiff states he was not treated for his symptoms and Nurse Jones did not order the MRI until December 12th following a confrontation. *Id.* at ¶ 4(D). The MRI was done on December 13th and it was normal. *Id.* at ¶ 4(E) & pg. 48. No further testing was done and Plaintiff states he received no treatment. *Id.* at ¶ 4(F). Plaintiff also believed the MRI showed no evidence of recent hemorrhage because medical staff delayed three months before ordering it. *Id.* at pg. 49.

---

[1] Presumably this date is in 2012. In his response, Plaintiff has the year written as 2013. However, Plaintiff was incarcerated in the BCDC on June 2, 2013.

[2] Again, Plaintiff has the year written as 2013. However, this date must be in 2012 as Plaintiff was incarcerated in the BCDC on June 29, 2013.

AO72A
(Rev. 8/82)

According to Plaintiff, the physician who did the MRI stated that Plaintiff should have a CT scan immediately as his physical and mental symptoms merited it. *Resp.* at pg. 51 (grievance dated December 15, 2012). Plaintiff stated that the physician believed it was probable that Plaintiff suffered a severe concussion and perhaps a contusion and should be see by a neurologist. *Id.*

Plaintiff was asked to describe how Nurse Jones exhibited deliberate indifference to his serious medical needs. He responded:

> Nurse Jones was made aware of my medical needs [and] symptoms as early as Sept. 2012. I met with her and Detective Watson at the B pod door on two occasions in October 2012. She said she would get me immediate treatment. There were two medical grievances from Sept. & Oct. 2012 that were never answered or returned. The November medical request (grievance) refers to these and was not contested. My symptoms were obviously requiring treatment serious concussion. She knew I was ill and did not do her job.

*Resp.* at ¶ 5.

Plaintiff was asked to describe how Dr. Lee exhibited deliberate indifference to his serious medical needs. He responded:

> I saw Dr. Lee perhaps on November 13, 2012. See the grievance dated Nov. 11, 2012. His observations are relevant and I should have received medical treatment or relief from the 'serious medical condition' a concussion that left me with obvious amnesia, nausea, vomiting, confusion, my pupils were not affixed. A question arises why did he not order medical testing then? He is the doctor. Nurse Jones called in the MRI Dec. 12, 2012. There is no record of me being prescribed any treatment for relief at all. Nothing was done. I was needing medical attention for a serious medical condition. I suffered needlessly. Dr. Lee was employed by Sheriff Hickman of Boone County.

*Resp.* at ¶ 6.

Plaintiff also claims Detective Watson, Jason Day, and Sheriff Hickman exhibited deliberate indifference to his serious medical needs. Specifically, Plaintiff states:

-4-

> Detective Watson met with me on two occasions with Nurse Jones in October 2012 and also advised medical needs immediately.  Jason Day was also made aware of my medical request.  He is the jail administrator.  Both he and Sheriff Hickman should be held responsible for my medical needs as I was house in their facility.

*Resp.* at ¶ 7.

BCDC inmates are allowed to order commissary items if they have sufficient funds to pay for the items.  *Resp.* at ¶ 8(A).  Plaintiff had sufficient funds to order commissary on multiple occasions.  *Id.* at 8(B).  The commissary sells over the counter pain medication such as Ibuprofen, sinus medication, Tums, triple antibiotic cream, and flexible adhesive bandages.  *Id.* at ¶ 8(C).  Plaintiff ordered an antacid on one occasion on September 24, 2012.  *Id.* at ¶ 8(D).  Plaintiff did not order any other over-the-counter medication during his incarceration at the BCDC.  *Id.* at ¶ 8(E).

During Plaintiff's incarceration at the BCDC, he was able to send and receive personal mail.  *Resp.* at ¶ 9(A).  He was able to send and receive legal mail in envelopes.  *Id.* at ¶ 9(B). He had access to stamped postcards, envelopes for legal mail, and something to write with.  *Id.* at ¶ 9(C).  He did not have to put legal mail on postcards.  *Id.* at ¶ 9(D).  He had access to a telephone.  *Id.* at ¶ 9(E).  Visitation was allowed.  *Id.* at ¶ 9(F).

Plaintiff maintains the postcard only policy for personal communications violates his rights in the following ways:

> Right to privacy.   Postcards allowed anybody to read personal mail. Correspondence on many personal and legal issues was hinder[]ed as there was no privacy at all.  U.S. citizens have a right to U.S. postal mail (letters).  What gives the Boone County Detention Center a right to take that?  This rises to a constitutional civil rights violation.  It's cruel and unusual punishment to take my rights to correspon[e]nce by personal letter.  My rights to certain privacy were violated.

*Resp.* at ¶ 9(G).

AO72A
(Rev. 8/82)

Plaintiff asserts that the stated reason for the implementation of this policy, to cut down on contraband entering the jail, is a guise for wanting to stop "male inmates from sending letters to their family and having their family send included letters back to female detainees." *Resp.* at ¶ 9(H).  This policy was in effect the entire time Plaintiff was incarcerated at the BCDC.  *Id.* at ¶ 9(I).

On September 25, 2012, Plaintiff filled out a voluntary statement form indicating that he had been kidnaped on May 1st and held by individuals in Boone County.  *Resp.* at ¶ 10(A) & pgs. 31-38.  Plaintiff was asked why he waited so long to report the kidnaping.  He responded: "I wanted justice.  Society needed to be protected.  My amnesia had a direct effect on this also.  When I realized the severity of the concussion, I wanted them to face justice for what they did wrong." *Id.* at ¶ 10(B).

Investigator Ryan Watson was initially in charge of investigating Plaintiff's claim that he had been kidnaped.  *Resp.* at ¶ 10(C).  In October of 2012, Watson interviewed the two individuals who Plaintiff said kidnaped him.  *Defts' Ex.* B.  They denied any involvement.  *Resp.* at ¶ 10(E).

On October 8, 2012, Plaintiff submitted a grievance form directed at Watson.  *Resp.* at pg. 39.  This grievance dealt with the alleged June 2nd kidnaping.  *Id.*  He also stated that he needed an emergency CT scan.  *Id.*

In approximately March of 2013, Investigator Bob King took over the investigation.  *Defts' Ex.* B.  King reviewed all information collected by Watson.  *Id.*  The case file is still open but no arrests have been made.  *Id.*

Plaintiff was asked to describe how he believed he was discriminated against by Watson and King.  He responded:

-6-

They really did not do anything. They did not do their jobs as investigators. The witnesses listed were never brought in for questioning. David 'Rudy' Salisbury admitted to the incident taking place but was not pressed further. The investigators were inadequate and not at all professional.

*Resp.* at ¶ 10(J); *see also Resp.* at pgs. 43-44 (grievance complaining of discrimination by Watson and possibly King).

The BCDC did not have any legal materials that inmates could consult. *Resp.* at ¶ 11(A). There was no law library in another location that could be used by inmates. *Id.*

Plaintiff maintains he was prejudiced by the lack of a law library in connection with *Brown v. Watson, et al.,* Civil No. 10-3080. *Resp.* at ¶ 11(B). He maintains he could not properly prosecute the case or respond to a summary judgment motion because he had no access to legal cases. *Id.*

Plaintiff maintains he was retaliated against by Nurse Jones and Watson. *Resp.* at ¶ 12. He was asked to state: (a) when the alleged retaliation occurred; (b) how they retaliated against him; (c) how he was injured by the retaliation; and (d) whether he submitted a grievance about this issue. *Id.*

He responded:

On or about Dec. 11, 2012 Nurse Jones entered 'B' pod. I asked her about being denied any treatment. I also mentioned that I had not been scheduled for the MRI etc. She told me to add her to my lawsuit. I submitted an unanswered grievance to Jason Day minutes later. The following day Nurse Jones told me I was scheduled [for] the MRI Dec. 12, 2012. Dr. Lee was supposed to had Nurse Jones order this Nov. 13, 2012.

Nurse Jones also intercepted a grievance filed Dec. 15, 2012. It was addressed to Sheriff Hickman, Jason Day and Dr. Lee. I was still seeking relief from the symptoms listed in this grievance.

*Id.*

-7-

## 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## 3.  Discussion

Defendants maintain that the Plaintiff's constitutional rights were not violated in anyway. They argue that: (1) there was no deliberate indifference to the Plaintiff's serious medical needs; (2) Plaintiff had no constitutional right to an investigation of the crimes he alleges occurred; (3) the postcard mail policy did not violate the Plaintiff's First Amendment rights; (4) any alleged denial of access to a law library did not impede the Plaintiff's access to the courts; (5) Plaintiff was not discriminated against; and (6) they are entitled to qualified immunity because Plaintiff

-8-

cannot offer any evidence that any Defendant had knowledge from which they could draw an inference of a serious risk to Plaintiff.

### A.  Denial of Medical Care

"Under the Eighth Amendment's proscription against cruel and unusual punishments, prison officials must provide medical care to inmates." *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008)(internal quotation marks and citation omitted). "A prison's medical staff violates the Eighth Amendment if they commit acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs." *Meuir v. Green County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007)(internal quotation marks and citation omitted).

To establish a prima facie case, Plaintiff must demonstrate that:  (1) he suffered from an objectively serious medical need; and (2) Defendants actually knew of, but deliberately disregarded, that need.  *Id.*

The decision of what diagnostic tests are necessary is one ordinarily left to the judgment of medical personnel.  *See e.g., Estelle v. Gamble*, 429 U.S. 97, 107 (1976).  In this case, although it was delayed, an MRI was performed which showed normal results.  Plaintiff alleges he also needed a CT scan done but what medical tests should be run involves the exercise of professional judgment and does not constitute deliberate indifference. *See e.g., Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)(prison officials do not violate Eighth Amendment when, in exercise of their professional judgment, they refuse to implement inmate's requested course of treatment).

Furthermore, "[a] prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011)(internal

quotation marks and citation omitted).    Plaintiff has presented no evidence that any delay attributable to the medical Defendants adversely impacted his prognosis.

With respect to the non-medical Defendants, liability under § 1983 requires some personal or direct involvement in the alleged unconstitutional action.  *See e.g., Ripon v. Ales*, 21 F.3d 805, 808-09 (8th Cir. 1994).   There is nothing in the summary judgment record that suggests the non-medical Defendants were involved in the decision of what medical care should be ordered for inmates in general or for the Plaintiff in particular.  *See Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).  General responsibility for supervising the BCDC is insufficient to establish personal involvement. *Reynolds v. Dormice*, 636 F.3d 976, 981 (8th Cir. 2011).   Defendants are entitled to summary judgment on this claim.

### B.  Failure to Investigate Crimes

There is no constitutional right to have law enforcement officials investigate a reported crime.   *See e.g., Sheets v. Mullins*, 287 F.3d 581 (6th Cir. 2002)(no due process or equal protection violation by sheriff's department sergeant in responding to a call reporting domestic violence); *Doe v. Mayor and City of Council of Pocomoke City*, 745 F. Supp. 1137, 1139 (D. Md. 1990)("The Court is not aware of a constitutional, statutory, or common law right that a private citizen has to require a public official to investigate or prosecute a crime.").   "The Due Process Clause of the Fourteenth Amendment does not impose upon the state an affirmative duty to protect its citizens [against illegal private acts], but rather, places limitations on affirmative state action that denies life, liberty, or property without due process of law."  *Kallstrom v. City*

-10-

*of Columbus*, 136 F.3d 1055, 1065 (6th Cir. 1998)(*citing DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989)).

"[F]ederal courts are not entrusted with the responsibility of ensuring the effective enforcement of state criminal laws; that role falls to state and local law enforcement authorities. It is the duty of executive officials–not the courts–to take care that the criminal laws are faithfully executed." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1205 (10th Cir. 2004)(*citing* U.S. Const., art. II, § 3; *Morrison v. Olson*, 487 U.S. 654, 690 (1988)); *see also Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993)(police officer had no constitutional duty to conduct investigation of plaintiff's assault charge), *aff'd* 23 F.3d 410 (7th Cir. 1994). In short, "the law is clear that a private citizen has no constitutional, statutory, or common law right to require a public official to investigate or prosecute a crime." *Woods v. Miamisburg City Schools*, 254 F. Supp. 2d 868, 873 (S.D. Ohio 2003)(citations omitted).

### C. Postcard Only Policy

Next, Plaintiff claims the BCDC postcard only policy ("Policy") violates his constitutional rights. Defendants argue the Policy did not violate Plaintiff's constitutional rights and even if it did Plaintiff has failed to show any personal involvement by either Sheriff Hickman or Day. Finally, Defendants argue they are entitled to qualified immunity on this claim.[3]

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

---

[3]Defendants' qualified immunity argument does not address the law as to each claim separately. Instead, they make a broad argument that Plaintiff cannot establish a violation of clearly established law.

AO72A
(Rev. 8/82)

457 U.S. 800, 818 (1982).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343 (1986)).  The inquiry is normally one of pure law.  *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

The doctrine of qualified immunity shields officials acting only in their individual capacities.  *Brandon v. Holt*, 469 U.S. 464, 472-73 (1985).  Any claims against the Defendants in their official capacities may not be defended against on the basis of qualified immunity.  *Id.*

In addressing qualified immunity I must, considering the facts in the light most favorable to Plaintiff, determine whether the officer's conduct violated a constitutional right, and if it did, whether the right was "clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted."  *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).

For a period of time, the record indicates the Policy at the BCDC was instituted in an attempt to curtail contraband entering into the facility.  *Defts' Ex.* A at ¶ 10.  The Policy required all correspondence for personal detainee mail, whether incoming or outgoing, to be on postcards. Inmates were still allowed to send and receive privileged mail in envelopes.  *Id.* at ¶ 11.  During all times, regardless of the Policy, inmates retained the right to visitation and phone use.  *Id.* at ¶ 13.

Plaintiff maintains that the BCDC was not having problems with contraband entering the facility through the mail and that the Policy served no legitimate governmental purpose. While he was able to send and receive personal mail, he contends the Policy violated his First Amendment rights as it took away any privacy with respect to personal communications and

-12-

limited the amount of information that could be communicated to what could be written on one side of a postcard.

It is well established that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Leonard v. Nix,* 55 F.3d 370, 374 (8th Cir. 1995) (internal quotations omitted). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Specifically, the Eighth Circuit Court of Appeals held "prison officials may lawfully censor prison mail that is detrimental to the security, good order and discipline of the institution," however, this mail policy "must advance a legitimate penological interest." *Kaden v. Slykhuis,* 651 F.3d 966, 968 (8th Cir. 2011) (internal quotation marks and citation omitted).

"Because the Constitution permits greater restriction of [First Amendment] rights in a prison than it would allow elsewhere, restrictive prison regulations are normally viewed under the four-factor *Turner* test to determine whether they are reasonably related to legitimate penological interests." *Holloway v. Magness*, 666 F.3d 1076, 1080 (8th Cir. 2012)(internal quotation marks and citation omitted). The *Turner* four-factor test is:

> (1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; (2) whether alternative means of exercising their rights remain open to the prisoners; (3) whether accommodation of the asserted rights will trigger a "ripple effect" on fellow inmates and prison officials; and (4) whether a ready alternative to the regulation would fully accommodate the prisoners' right at *de minimis* cost to the valid penological interest.

*Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012)(*citing Turner v. Safley*, 482 U.S. 78 (1987); *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989)).

Defendants assert the legitimate penological interest supporting the Policy is to prevent the introduction of contraband into the BCDC.  It is well established that controlling contraband is a legitimate security interest.  *See Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993) (holding security, rehabilitation, and prevention of sexual aggression among inmates were all valid penological goals) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987)); *see also Pell v. Procunier,* 417 U.S. 817 (1974); *Harris v. Bolin*, 950 F.2d 547, 549 (8th Cir. 1991) (a policy that allows prison officials to reject incoming mail deemed detrimental to the security of the unit does not violate the First Amendment).

However, there is no case law in the Eighth Circuit addressing whether a postcard only policy such as the Policy instituted here is rationally related to a legitimate penological interest such as controlling contraband.  Further, District Courts outside of this circuit that have addressed this issue have come to contradictory conclusions.  *See e.g.,Prison Legal News v. Columbia County,* 942 F. Supp. 2d 1068 (D. Ore. April 24, 2013) (a policy prohibiting inmates from receiving mail not on postcards violated the First Amendment because it was not rationally related to preventing receipt of contraband and enhancing jail security when there was no indication a postcard only policy was more effective at preventing introduction of contraband than the jail's prior policy of opening and inspecting incoming letters); *Covell v. Arpaio,* 662 F.Supp2d 1146 (D. Ariz. Sept. 24, 2009) (holding  a mail policy only allowing metered postcards for non-privileged mail was reasonably related to the legitimate penological interest in reducing contraband smuggling); *Cox v. Denning*, Civil No.12-2571, 2014 WL 4843951, *14-23 (D. Kansas Sept. 29, 2014)("[P]ostcard-only policy, analyzed under the four *Turner* factors, is not rationally related to the legitimate penological interests asserted by Defendants and impermissibly infringes upon the First Amendment right of Plaintiff."); *Prison*

-14-

*Legal News v. County of Ventura*, Civil No. 14-0773, 2014 WL 2736103, *3-8 (C.D. Cal. June 16, 2014)(ordering the suspension of enforcement of the postcard-only policy for incoming mail); *Prison Legal News v. Chapman*, Civil No. 3:12-cv-00125, 2014 WL 4247772, *4-5 (M.D. Ga. Aug. 26, 2014)(postcard-only policy passes constitutional muster under *Turner* analysis); *Prison Legal News v. Bezotte*, Civil No. 11-cv-13460, 2013 WL 1316714, *3-5 (E.D. Mich. March 29, 2013)(denying motion for preliminary injunction finding postcard policy constitutional under *Turner* analysis); *Althouse v. Palm Beach County Sheriff's Office,* Civil No. 12-80135, 2013 WL 536072 (S.D. Fla. Feb. 12, 2013) (holding a postcard only policy to decrease the amount of contraband that enters the jail is rationally related to prison security).

Accordingly, I find no clearly established law regarding a "postcard only" mail policy existed at the time Defendants instituted the Policy at issue and therefore, a reasonable official would not have understood this policy to be unlawful in this situation. For this reason, Sheriff Hickman and Day are entitled to qualified immunity regarding Plaintiff's individual capacity postcard only mail policy claims.

With respect to the official capacity claims against Sheriff Hickman and Day, the Court has insufficient information before it to analyze the Policy under the *Turner* factors. The Court certainly cannot, as urged by Defendants, find the Policy constitutional based on their bare assertion that it served the needs of the detention center to cut down on contraband coming into the facility. Nor can the Court find that the sheriff and jail administrator were not personally involved in the adoption of this policy. In fact, it would be hard to imagine a situation in which someone other than the sheriff and jail administrator adopted a detention center policy.

-15-

### D.  Denial of Access to the Library

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977)).   In *Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail.  Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts.  To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims.  Alleging theoretical inadequacies is insufficient.  Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343 (1996) and *Bounds v. Smith*, 430 U.S. 817 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'"  *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

In this case, Plaintiff states he suffered actual injury in connection with *Brown v. Watson, et al.,* 10-3080.  He indicates he had difficulties with completing his response to a summary judgment motion.  The docket sheet reflects that Plaintiff filed a substantive response and it was

AO72A
(Rev. 8/82)

considered by the Court.  His response was filed while he was incarcerated in the BCDC.  He missed no deadlines imposed by the Court.  The case was not dismissed because he failed to file documents with the Court.  *See e.g. Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).  As Plaintiff suffered no injury because he was denied access to a library, this claim fails.

### E. Discrimination/Retaliation

Plaintiff maintains he was discriminated against by Sheriff Hickman, King, and Watson because of ill feelings over Civil No. 10-3006.  He also maintains that Nurse Jones and Watson retaliated against him in connection with his requests for medical care because of the filing of this lawsuit.

In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."  *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001)(citation omitted); *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)(same).  "Indeed, the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable."  *Id.; see also Dixon v. Brown*, 38 F.3d 379, 380 (8th Cir. 1994)("[W]hen retaliatory conduct is involved, there is no independent injury requirement.").

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) that he engaged in protected activity; (2) that the defendants in response took adverse action; and (3) that his protected activity was the cause of the retaliation.  *See Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994)(threat of retaliation is sufficient injury if made in retaliation for inmate's use of prison grievance procedure).

-17-

The filing of an inmate lawsuit is protected First Amendment activity. *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007). "To avoid summary judgment, [Plaintiff] must submit affirmative evidence [of] retaliatory motive." *Id.* (internal quotation marks and citation omitted).

Because nearly every otherwise routine decision may potentially be viewed as a retaliatory act, it has been recognized that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Further, the courts have recognized that prison officials must have broad administrative authority. *Graham*, 89 F.3d at 79. For this reason, it has been said that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)(not every response to a prisoner's exercise of a constitutional right is actionable); *see also Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996)(per curiam)(Speculative and conclusory allegations cannot support a retaliation claim).

In this case, Plaintiff has made only broad conclusory allegations. His claim is based primarily on the alleged failure to investigate the kidnapings. However, there is nothing to suggest any alleged failure to investigate is related in anyway to a lawsuit filed by the Plaintiff. Defendants are entitled to summary judgment on this claim.

### 4. Conclusion

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 36) be **GRANTED in part and DENIED in part.** Specifically, the Motion should be granted with respect to the following claims: (1) the denial of medical care claim; (2) the access to the law library claim; (3) the failure to investigate claim; (4) the retaliation claim; and (5) the individual capacity postcard only policy claims. This would dismiss all claims against Bob King, Ryan Watson, Dr. Lee and Nurse Mandy Jones. The Motion should be denied with respect to

-18-

the official capacity claims asserted against Sheriff Hickman and Jail Administrator Day based on the postcard only policy.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 17th day of February, 2015.


/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

-19-